UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
John Kopcinski,                          :
                                         :
                          Plaintiff,     :          **MEMORANDUM & ORDER**
                                         :
         -against-                       :          06-CV-2747 (DLI)
                                         :     ___
Commissioner of Social Security,[1]      :
                                         :
                          Defendant.     :
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

On October 5, 2001, plaintiff John Kopcinski filed an application for disabled widower's insurance benefits ("DWIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 402(e), on the earnings record of Lorraine Kopcinski, who had died on September 13, 2001. Plaintiff's application was denied initially and on reconsideration. Plaintiff testified at a hearing held before an Administrative Law Judge ("ALJ") on February 14, 2005. By decision dated December 28, 2005, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act. On May 5, 2006, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review.

The Commissioner seeks reversal of his final decision and moves to remand the case for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). Plaintiff agrees that reversal is required, but argues that there is substantial evidence in the record that he is disabled. Plaintiff moves for judgment on the pleadings and to remand the case solely for the

_____

[1]Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for Commissioner Jo Anne B. Barnhart as the defendant in this action.

1

calculation and payment of benefits pursuant to Fed. R. Civ. P. 12(c). For the reasons stated below, the Commissioner's motion is granted, plaintiff's motion is denied, and the case is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I.    Summary of Facts

*Medical Evidence (Mental)*

Plaintiff claims a disability onset date of February 27, 2001 due to back pain, panic attacks, hypertension and dysthymic personality. However, plaintiff's documented treatment history for psychiatric problems dates back to 1991. (Admin. R. at 229.) A consultation sheet dated June 26, 1991 states that plaintiff complained of being "very nervous," on the verge of a "nervous breakdown," and wished to speak with a psychiatrist. (*Id*.) He presented with anxiety and demoralization from trying to cope with his wife's mental illness; plaintiff's wife, Lorraine Kopcinski, suffered from manic depressive disorder and schizophrenic disorders at the time. Plaintiff reported feeling anxious, helpless, and was unable to sleep. He also reported having difficulty concentrating and, as a result, had lost his job as an Empire Blue Cross Blue Shield claims auditor. With the exception of having seen a psychiatrist in the past, at which time plaintiff received a prescription for valium, plaintiff reported no further treatment. The diagnosis was adjustment disorder with anxious mood. (*Id*. at 230.)

Plaintiff was again diagnosed with adjustment disorder with anxious mood after being examined in the psychiatric clinic of the Veterans Administration Medical Center ("VA MC") on July 23, 1991 and August 13, 1991. (*Id*. at 231, 234-38.) Plaintiff received further treatment on September 11, 1991 and September 20, 1991. (*Id*. at 244-25.) A "closing note" dated September 27, 1991 reported that plaintiff had called to cancel his appointment because he was moving to

Albany to live in a house owned by his parents. The "note" further reported that plaintiff intended to continue with his treatment at the VA Hospital in Albany. (*Id*. at 246.)

On May 9, 1995, plaintiff saw Dr. Robert J. L. Waugh. (*Id*. at 119-21.) On mental health examination, Dr. Waugh found plaintiff to be somber and mildly depressed. Plaintiff reported that he had experienced panic feelings lasting a few seconds for the past three years, and that although he was occasionally depressed, he denied crying spells or ever having had severe depression or a hypomanic episode. Dr. Waugh's "overall impression" was that plaintiff had been "depressed and anxious over his unemployment and his wife's severe mental illness." Dr. Waugh diagnosed plaintiff with dysthymic disorder.

Plaintiff's next recorded psychiatric examination took place almost six years later on February 14, 2001. Dr. Ronald E. Hanover, a psychologist, examined plaintiff in connection with his claim for non-service connected disability pension from the VA. (*Id*. at 286-88.) Plaintiff presented in an open manner, conversed easily and cooperated well. He denied hallucinations and delusions, as well as suicidal and homicidal ideations. Plaintiff presented no obvious psychotic thought or behavior. His affect was dull, and his mood unhappy. Dr. Hanover noted that plaintiff had been diagnosed with panic attacks and was medicated by Sertaline. The panic attacks occurred once a week, typically while grocery shopping, and were accompanied by rapid heart beat, sweating, fear of losing control, and dizziness. Dr. Hanover diagnosed panic disorder, without agoraphobia, and lower back pain. Plaintiff's Global Assessment of Functioning ("GAF") was 55.[2] Dr. Hanover opined that plaintiff was unable to work at that time, had been unable to work for the past ten years,

---

[2]A GAF of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000).

and seemed unable to work well into the future due to his ailing back, panic attacks and dysthymic personality. Based in part on Dr. Hanover's report, the Department of Veterans Affairs issued a decision on February 27, 2001, granting plaintiff a nonservice connected disability pension. (*Id*. at 307-10.)

Plaintiff was next evaluated on November 8, 2001 by Dr. Eugene Allen, a psychiatrist. (*Id*. at 127-28.) Dr. Allen noted that plaintiff had received treatment for panic attacks from 1991 to 1992, but had ceased treatment to care for his wife. Although plaintiff's panic attacks seemed to reoccur in July 2000, for which he sought out treatment at the local VA and received a thirty-day supply of Zoloft, plaintiff was not currently under psychiatric treatment. Consequently, plaintiff continued to have panic attacks twice a month for five to ten minutes. Upon evaluation, Dr. Allen found plaintiff to have good relatedness and eye contact. His speech was relevant and coherent, and no psychopathology was elicited. Both his mood and affect were normal, as well as his insight and judgment. Plaintiff was oriented in three spheres. In Dr. Allen's opinion, plaintiff had a satisfactory ability to understand, carry out and remember instructions, as well as a satisfactory ability to respond appropriately to supervision, co-workers and work pressures in a work setting, so long as he received treatment for his panic attacks. Dr. Allen diagnosed plaintiff with panic disorder, and recommended that plaintiff return to psychiatric therapy.

In December 2001, a non-examining review psychiatrist with the State Agency evaluated plaintiff's eligibility for DWIB. (*Id*. at 140.) The psychiatrist noted that plaintiff had no restrictions of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation.

*Medical Evidence (Physical)*

A February 12, 2001 exam of plaintiff's lumbrosacral spine revealed degenerative disc disease at the L3-4 and L4-5 levels, as well as slight left scoliosis. (*Id*. at 283.) On April 31, 2001, Dr. Anita Trikha, an attending physician from the VA MC, examined plaintiff. (*Id*. at 315-16.) Plaintiff's physical examination was unremarkable, including full motor strength in all four extremities, intact sensation and orientation in all three spheres. A depression screen was negative. Dr. Trikha counseled plaintiff on the benefits of improved nutrition and regular exercise, and cleared him to engage in regular moderate activity for at least thirty minutes three times a week.

A colonoscopy performed on October 15, 2001 revealed that plaintiff had a tubular polyp adenoma, and a pulmonary function test performed on October 31, 2001 revealed that plaintiff had moderate obstructive airways dysfunction with significant bronchodilator response and hyperinflation. (*Id*. at 116-17, 322-23.)

On November 8, 2001, plaintiff saw Dr. Soo Park, an internal medicine consultant, complaining of high blood pressure for ten years, back pain for many years, panic attacks and shortness of breath. (Admin. R. at 122-26.) Plaintiff reported having undergone two back surgeries due to herniated discs and taking Tylenol to ease his pain. Plaintiff further reported having experienced panic attacks several times a month over the past ten years, for which he used to take Sertaline until it ceased to improve his condition. Plaintiff also used an albuterol inhaler daily, and had been smoking cigarettes for over forty years. On physical examination, plaintiff's blood pressure was 170/100 mm Hg, and he was able to dress and undress, as well as get on and off of the examination table, without any difficulty. Plaintiff was able to walk normally, but had shortness of breath with minimal activities. An examination of plaintiff's chest and lungs revealed an increased

antero-posterior diameter and slightly diminished breathing sound, but no wheezes, rhonchi or rales. Plaintiff's heart had a point of maximal impulse at the fifth intercostal space on the midclavicular line, with regular rhythm, normal S1 and S2 heart sounds and no murmur or gallops. A review of plaintiff's abdomen was unremarkable. He retained a normal range of motion in his extremities, and the electrocardiogram showed no evidence of acute ischemia or left ventricular hypertrophy, although sinus tachycardia was noted. Dr. Park noted some limitation of plaintiff's lumbrosacral spine, but his joints had a full range of motion without swelling, warmth or tenderness. There was no atrophy, spasm, subluxation, contractures, ankylosis or instability. Dr. Park's "final impression" was high blood pressure which is not well controlled with no complication, back pain in the lumbar spine with previous surgery, panic attacks, and shortness of breath with mild degree of emphysematous changes. Dr. Park confirmed that plaintiff had limitations of a moderate degree with lifting, bending, walking, standing, pushing and pulling on arm controlls.

On March 7, 2002, an magnetic resonance imaging ("MRI") of plaintiff's lumbrosacral spine revealed post-operative changes on the left at the L3-4 and L4-5 levels, a residual or recurrent small left paracentral disc herniation at L3-4 level, with inferior extension, and enhanced scar tissue at the L4-5 level without evidence of recurrent disc herniation. (*Id*. at 325.) Upon examination, Dr. Siddharth Kapoor, a neurologist at the VA MC, indicated that plaintiff's pain was confined to the lower back and did not radiate in a radicular fashion. (*Id*. at 326.) Dr. Kapoor referred plaintiff for an electromyograph ("EMG"), which was performed on March 27, 2002. (*Id*. at 330.) The findings from the EMG suggested right sural sensory neuropathy, which seemed to be an axonopathy.

At a primary care follow-up visit on March 21, 2002, Dr. Trikha noted that plaintiff's hypertension was well controlled with current medication; plaintiff was cutting back on tobacco use,

and his liver enzymes were elevated. Dr. Trikha prescribed an inhaler for plaintiff's emphysema. (*Id*. at 327-28.)

Plaintiff underwent three different MRIs on July 16, 2002: the MRI of plaintiff's thoracic spine revealed no evidence of disc/ridge complexes or central canal stenosis; the MRI of plaintiff's cervical spine revealed mild spondylosis at the C5-6 and C6-7 levels; and the MRI of plaintiff's lumbar spine revealed Grade 1 spondylolisthesis of L5 on S1, status post hemilaminotomy at L4-5 and L5-S1 levels, and degenerative disc disease at the L3-4, L4-5 and L5-S1 levels. (*Id*. at 331-33.)

Dr. Trikha re-examined plaintiff on April 4, 2003. (*Id*. at 366-68.) Dr. Trikha's "progress note" indicates that plaintiff's blood pressure was stable at 140/70 mm Hg, his lungs were clear to auscultation, and his heart had a regular rate and rhythm. Plaintiff's liver enzymes remained elevated, most likely because of plaintiff's alcohol use, but both a depression screen and testing for the Hepatitis C virus were negative. Dr. Trikha again educated plaintiff on the health benefit of smoking cessation.

On May 5, 2003, an echocardiogram revealed right and left ventricles with normal size and normal systolic function. (*Id*. at 347-48.) X-rays of plaintiff's chest revealed normal heart size and clear lungs, with no hilar mass or pleural effusion. (*Id*. at 349.)

On August 11, 2003, Dr. Trikha increased plaintiff's blood pressure medications. (*Id*. at 364.) Plaintiff had no complaints at his February 23, 2004 visit with Dr. Trikha; he felt well and denied shortness of breath. (*Id*. at 361.) Dr. Trikha noted that plaintiff was drinking up to six beers on the weekends. During plaintiff's follow-up examination on October 22, 2004, plaintiff's blood pressure was 136/77 mm Hg, his lungs were again clear to ausculation, with good air entry and no crackles, heart rate and rhythm were regular, with no murmurs, gallops or rales, and a review of his

abdomen and extremities was unremarkable. (*Id*. at 359-60.) Dr. Trikha assessed good control of hypertension. Plaintiff's liver function studies were elevated, however, and Dr. Trikha educated plaintiff about the risk of binge drinking, particularly given past elevated liver function studies results.

An abdominal ultrasound taken on November 29, 2004 showed an essentially normal appearing liver parenchyma without dilated ducts or masses. (*Id*. at 347.) The ultrasound further showed a normal gallbladder area and unremarkable pancreas. The spleen, however, was borderline enlarged.

*Plaintiff's Benefits Application and Testimony*

Plaintiff was born on January 22, 1949, and has a general equivalency diploma ("GED"). (*Id*. at 381, 383.) Plaintiff entered the United States Air Force in 1968 at age nineteen and served until June 30, 1972. (*Id*. at 119, 215, 393.) Plaintiff worked as a shipping clerk from September 1979 to December 1982, as well as a warehouseman for a salvage company from February 1983 to January 1984. (*Id*. at 384.) Most recently, from November 1985 to April 1991, plaintiff worked as a claims auditor for Empire Blue Cross Blue Shield, a medical insurance company. (*Id*. at 384.) However, plaintiff stopped working in 1991 due to a combination of back pain and the need to care for his wife. (*Id*. at 385.)

Plaintiff's medical history began on January 19, 1971 when he slipped and fell on ice, injuring the back of his head. (*Id*. at 187.) One year later, on March 3, 1972, plaintiff was involved in an automobile accident and spent approximately two to three weeks in the hospital due to a resulting concussion. (*Id*. at 285.) In 1984, plaintiff injured his back working and, as a result, underwent two operations. (*Id*. at 106, 401.) He was awarded a closed period of disability benefits, which ended

8

when he ultimately returned to work in 1985.  (*Id*. at 401-03.)  At the hearing, plaintiff described his current back pain as a constant pulling pain; however, the only medication plaintiff took to ease the pain was Tylenol.  (*Id*. at 385-86.)  Plaintiff testified that, due to his back pain, he could not sit for longer than one hour nor stand for longer than twenty minutes.  (*Id*. at 189-90.)  Plaintiff further testified that he could not lift nor carry more than five pounds.  (*Id*. at 391.)  However, he could walk about seven or eight blocks.  (*Id*. at 390, 393.)  With respect to plaintiff's emphysema, plaintiff testified that he used three different inhalers, which helped his breathing "a little."  (*Id*. at 386.)  Although plaintiff had attempted to quit smoking on numerous occasions, he continued to smoke up to six cigarettes per day.  (*Id*. at 396-97.)  Plaintiff testified that his hypertension was intermittently controlled with medication.  (*Id*. at 386-87.)  Plaintiff also testified that his panic attacks are precipitated by crowds of people.  (*Id*. at 388, 396.)  However, he no longer took any medication for his panic attacks because they made him "sick to [his] stomach;" rather, he "deal[t] with them the best [he] c[ould]."  (*Id*. at 387-88.)  Finally, plaintiff neither received treatment nor took medication for his dysthymic condition.  (*Id*. at 388.)

According to plaintiff, he is able to grocery shop, cook, wash dishes, dust, do laundry, make the bed, mop and take care of his own personal needs.  (*Id*. at 98-99, 391-92.)  Plaintiff also enjoys reading, watching television and building model airplanes.  (*Id*. at 394-95.)  Plaintiff denied having any problems remembering what he had watched on television, and testified that he had a good friend who came over occasionally and spent the weekend.  (*Id*. at 395-96.)  In a report filed in connection with plaintiff's application, plaintiff stated that he talked on the telephone with friends and relatives everyday, invited friends over on the weekends, and played cards with friends.  (*Id*. at 101-02, 107.)  Plaintiff tried to go outside at least once a day.  (*Id*. at 100, 107.)

*Expert Medical Testimony*

The ALJ also heard testimony from an impartial medical expert, Dr. Theodore Cohen, to determine whether plaintiff suffered from severe medical conditions. (*Id*. at 410.) Dr. Cohen testified that plaintiff's history of hypertension was fairly well-controlled, and his panic attacks did not seem to be disabling. (*Id*. at 410, 411.) With respect to plaintiff's diagnosis of emphysema (COPD), Dr. Cohen noted that plaintiff continued to smoke. (*Id*. at 410.) Nevertheless, although plaintiff's pulmonary function tests revealed a somewhat diminished pulmonary function, his condition was not of Listing severity. (*Id*.)

Dr. Cohen testified that plaintiff's "big problem right now [wa]s his orthopedic one, mainly his back." (*Id*. at 411.) Dr. Cohen noted that a cervical spine MRI performed in 2002 showed mild spondylosis, mild arthritis, a thoracic MRI was negative, and a lumbrosacral MRI showed some scoliosis and narrowing. (*Id*. at 412.) However, Dr. Cohen noted plaintiff's testimony that he was able to ambulate six to eight blocks without stopping, which, according to Dr. Cohen, is "pretty good going uphill . . . ." (*Id*. at 411.) Although plaintiff "had two discs removed in '84 and has some backache," Dr. Cohen found no evidence of radiculopathy or other evidence demonstrating that plaintiff's low back condition was disabling. (*Id*. at 412.)

Taking the evidence together as a whole, Dr. Cohen opined that plaintiff's conditions neither met nor equaled a Listed impairment. (*Id*.) Dr. Cohen further opined that plaintiff retained the ability to perform light work activities.[3] (*Id*.)

_____

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing the full or wide range of light work, you must have the ability to do

Amy Leopold, an impartial vocational expert, testified that plaintiff's past relevant work as a "claims auditor" (Dictionary of Occupational Titles ("DOT") Code No. 241.267-018) constituted sedentary, skilled work. (*Id*. at 433.) Ms. Leopold further testified that plaintiff had acquired technical skills related to his knowledge of medical and insurance issues; however, plaintiff made clear that he had not acquired computer data entry skills. (*Id*. at 433-35.) The ALJ then inquired as to the employment capability of a hypothetical individual with these factors: (1) a fifty-six year old individual; (2) with a GED; (3) past work experience as a claims auditor; (4) with hypertension under fair control, a somewhat diminished breathing capacity due to emphysema, a low back problem restricting sitting to one hour, mild spondylosis of the cervical spine, scoliosis and some narrowing of the lumbrosacral spine, and panic attacks with three to four episodes of heart palpitations per week, sweating and a feeling of impending doom; and (5) ability to perform the full range of light work. (*Id*. at 435-36.) In response, Ms. Leopold testified that three or four panic attacks per week could preclude the hypothetical individual's ability to sustain employment. (*Id*. at 436.) However, assuming that plaintiff did not suffer three to four panic attacks per week, Ms. Leopold testified that plaintiff could perform sedentary work if he could sit for one hour and take regular breaks. (*Id*. at 437.) On cross-examination, Ms. Leopold testified that although plaintiff had the appropriate skills to perform work in the insurance industry, his skills were not transferable to any other type of job. (*Id*. at 438.)

---

substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

In a written decision dated December 28, 2005, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act and, therefore, was not entitled to DWIB. (*Id*. at 13-20.) The ALJ utilized the five-step sequential analysis set forth in 20 C.F.R. § 404.1520 to reach his conclusion. The ALJ resolved step one in plaintiff's favor because he had not performed substantial gainful activity since February 21, 1991. At step two, the ALJ found that plaintiff's impairments – back pain, hypertension, panic attacks and a dysthymic personality – were "severe" as defined by the Act. However, the ALJ resolved step three against plaintiff, finding that plaintiff's impairments, either alone or in combination, were not sufficiently "severe" to meet or equal an impairment listed in Appendix 1.

The ALJ next analyzed plaintiff's "residual functional capacity." Under step four, the ALJ concluded that plaintiff was unable to perform past relevant work as a claims auditor. However, the ALJ found that plaintiff retained the residual functional capacity to perform light work, with occasional nonexertional limitations in his ability to interact appropriately in large groups of people. The ALJ noted that the burden then shifted to the Social Security Administration to show that plaintiff could perform other work consistent with his age, education and work experience. At step five, the ALJ found that plaintiff, as an individual closely approaching advanced age with a GED and semi-skilled past relevant work history, could perform light work. The ALJ noted that Medical-Vocational Rules 202.05 and 202.15 directed a finding of "not disabled," signifying that there were a significant number of jobs existing in the economy that an individual such as plaintiff could perform.

## II.  Discussion

### A.  Standard of Review

In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (citation and internal quotation marks omitted).  The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript or the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing."  42 U.S.C. § 405(g).  Remand is the appropriate remedy where the ALJ incorrectly applied the law and failed to adequately develop the medical record. *See Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the . . . [Commissioner] for further development of the evidence." ) (citation omitted); *see also Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)) (remanding to the Commissioner for further development of the evidence where the ALJ "failed to fulfill her duty in [the claimant's] case in several respects.") (internal quotations and citation omitted).

**B.      Standard for Disabled Widow's Insurance Benefits**

An individual is "disabled" under the Act where there is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The claimant bears the initial burden of proof of showing disability by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require.  42 U.S.C. § 423(d)(5); *see also See Carroll v. Sec'y of Health and Human Servs.,* 705 F.2d 638, 642 (2d Cir. 1983).

Pursuant to 20 C.F.R. § 404.1505(a), there is a five-step process by which the ALJ determines disability under the Act.  If at any step the ALJ finds that the claimant is either disabled or not, the inquiry ends.  At the first step, the claimant is not disabled if he or she is working and performing "substantial gainful activity."  *Id*.  Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education, or work experience.  To be considered disabled, the claimant must have an impairment, or combination of impairments, which significantly limits his or her physical or mental ability to do basic work activities, satisfying the durational requirement in § 404.1509.  *See* 20 C.F.R. § 404.1520(c).  At the third step, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[4]

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" in steps four and five.  *See* 20 C.F.R. §§ 404.1520(e), 404.1545.  The "residual functional capacity" is "the most [the claimant] can still do despite . . .

_____

[4]20 C.F.R. pt. 404, subpt. P, app. 1.

limitations." 20 C.F.R. § 404.1545(a). The ALJ considers all of the claimant's impairments and symptoms, including pain, that may cause physical or mental limitations. *Id*. In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience; if so, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(g). The burden of showing that the claimant could perform other work in this final step shifts to the Commissioner. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

In addition, in order to qualify for benefits as a disabled widower, a claimant must establish that: (1) he is the widower of a wage earner who died fully insured; (2) he is at least fifty, but less than sixty years of age; and (3) he is disabled, as defined in 42 U.S.C. § 423(d). 42 U.S.C. § 402(e)(1). In addition, the disability must have commenced within seven years of the latest of the following events: (1) the month in which the wage earner died; (2) the last month in which the claimant was entitled to widow's insurance benefits; or (3) the last month in which there was a previous entitlement to widow's benefits. 42 U.S.C. § 402(e)(4).

## C.  Analysis of the ALJ's Decision

The Commissioner concedes that the ALJ committed certain legal errors when evaluating whether plaintiff was disabled under steps four and five of the sequential analysis. Specifically, the Commissioner acknowledges that the ALJ did not provide any rationale for his step four finding that plaintiff's residual functional capacity precluded the performance of his past relevant work, and the ALJ's determination that plaintiff could perform work, other than his past relevant work, existing in significant numbers in the national economy was deficient. The Commissioner moves to remand the

case for further administrative proceedings. Plaintiff, on the other hand, argues that a remand solely for the calculation and payment of benefits is warranted.

The court agrees with the Commissioner that this is not a case "[w]here the existing record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no further purpose." *Martinez v. Barnhart,* 262 F. Supp. 2d 40, 49 (W.D.N.Y. 2003); *see also Curry v. Apfel,* 209 F.3d 117, 124 (2d Cir. 2000). Rather, where "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the regulations," a remand by the court for further administrative proceedings is appropriate. *Manago v. Barnhart,* 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (collecting Second Circuit cases).

In addition to the errors conceded by the Commissioner, the court finds that the ALJ made other mistakes in his analysis that need to be remedied on remand. For instance, plaintiff correctly notes that the ALJ applied the incorrect legal standard for DWIB. Specifically, the ALJ stated: "Section 404.1577 of the regulations provides that . . . the impairments must be of a level of severity to prevent a person from doing any gainful activity. Age, education, and work experience are not considered in determining whether a widower is under a disability." (Admin. R. at 13.) Prior to November 5, 1990, section 223 of the Act provided that a widow was under a disability only if his mental or physical impairment(s) was of a level of severity deemed to be sufficient to preclude any gainful activity. However, as amended by section 5103 of the Omnibus Budget Reconciliation Act of 1990 ("OBRA") (Pub.L. 101-508), section 223 now permits a widower to be found disabled if his impairments are of such severity as to prevent the widower from engaging in his previous work, and considering his age, education and work experience, any other kind of substantial gainful work that exists in the national economy. The amended definition is effective for entitlement to monthly

benefits beginning in January 1991 or later, for which applications are filed or pending January 1, 1991, or filed later. Since plaintiff applied for DWIB on October 5, 2001, claiming an onset date of February 27, 2001, it is clear that the amended definition applies in the instant matter. *See Kier v. Sullivan,* 888 F.2d 244, 246 (2d Cir. 1989); 20 C.F.R. § 404.1505(a).

On remand, as set forth below, the ALJ should (1) reassess the classification of plaintiff's past relevant work as a "claims auditor," plaintiff's residual functional capacity, and whether plaintiff's residual functional capacity precluded the performance of plaintiff's past relevant work, and (2) obtain further vocational expert testimony regarding the transferability of plaintiff's skills and the number of jobs of an insurance nature existing in the national economy that plaintiff could perform.

*Evaluating Plaintiff's Residual Functional Capacity*

The ALJ's classification of plaintiff's past relevant work as a "claims auditor," a skilled position with a  Specific Vocational Preparation ("SVP") of 7, constitutes legal error, because it is blatantly contradicted by plaintiff's testimony. (Admin. R. at 19.)  As defined by DOT Code No. 241.267-018, a "claims auditor" must (1) analyze insurance claims to determine the extent of the insurance carrier's liability and settle claims with claimants in accordance with policy provisions, (2) compare data on claim applications, death certificates, or physician's statements with policy files and other company records to ascertain completeness and validity of claims, (3) correspond with agents and claimants to correct errors or omissions on claim forms and to investigate questionable entries, and (4) pay claimants amount due. *See* DOT, Code No. 241.267-018.  However, Ms. Leopold's examination of plaintiff revealed that plaintiff's duties were more analogous to those of a "medical-voucher clerk," a semi-skilled position with a SVP of only 3, because plaintiff's past relevant work merely involved taking claims submitted by health care providers and checking to see if they were

coded correctly.[5] (Admin. R. at 434.) Plaintiff did not acquire data entry skills because he never used a computer, and if plaintiff observed an error in one of the claim forms, "it would go back to the examiner;" plaintiff served as a "gate keeper before [the claims] actually went through the system." (*Id*. at 433-35.) The ALJ therefore erred in simply adopting Ms. Leopold's initial classification of a "claims auditor," because he failed to resolve the apparent discrepancy between plaintiff's subsequent testimony, the vocational expert's testimony and the DOT. *See* Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (S.S.A. Dec. 2, 2000) ("When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled.").

As the Commissioner concedes, the ALJ also erred in failing to provide any rationale for his determination that plaintiff's residual functional capacity to perform light work precluded the performance of his past relevant work. However, as a threshold matter, the court maintains reservations regarding whether the ALJ's determination that plaintiff retained the residual functional capacity to perform light work was in accordance with the applicable regulations. (Admin. R. at 17.) It is clearly permissible for an ALJ to evaluate the credibility of an individual's allegations of pain; however, this independent judgment should be arrived at in light of all the evidence regarding the extent of the pain. *See Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979). The ALJ must consider the "entire case record, including the objective medical evidence, the individual's own statements

---

[5]As defined by DOT Code No. 214.482-018, a "medical-voucher clerk" "examines vouchers forwarded to insurance carrier by doctors who have made medical examinations of insurance applicants, and approves vouchers for payment, based on standard rates. Computes fees for multiple examinations, using adding machine. Notes fee on form and forwards forms and vouchers to appropriate personnel for further approval and payment."

about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *See* SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996); *Rivera v. Schweiker,* 717 F.2d 719, 724 (2d Cir. 1983). Moreover, subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other objective medical evidence. *See Marcus,* 615 F.2d at 27.

Here, the ALJ failed to consider *all* the evidence regarding plaintiff's subjective complaints. Specifically, at the hearing, plaintiff described his current back pain as a constant pulling pain. (Admin. R. at 385-86.) Plaintiff's testified that, as a result, he can lift and carry no more than five pounds, and only sit for one hour, stand for fifteen to twenty minutes, and occasionally walk seven or eight blocks. (*Id*. at 389-91, 393.) Moreover, the medical evidence documents a history of chronic back pain due to injuries plaintiff sustained in 1984, which necessitated two surgical procedures. For instance, an examination of plaintiff's lumbrosacral spine on February 12, 2001 revealed degenerative disc disease and slight scoliosis. (*Id*. at 283.) On November 8, 2001, Dr. Park noted limitations of a moderate degree in plaintiff's ability to lift, bend, walk, stand, push and pull on arm controls due to back pain in the lumbar spine. (*Id*. at 122-26.) An MRI taken of plaintiff's spine on March 7, 2002 revealed post-operative changes on the left at the L3-4 and L4-5 levels, a residual or recurrent small left paracentral disc herniation at L3-4 level, with inferior extension, and enhanced scar tissue at the L4-5 level without evidence of recurrent disc herniation. (*Id*. at 325.) Although the MRI taken on July 16, 2002 of plaintiff's thoracic spine revealed no evidence of disc/ridge complexes or central canal stenosis, the MRI of plaintiff's cervical spine revealed mild spondylosis at the C5-6 and C6-7 level and the MRI of plaintiff's lumbar spine revealed Grade 1 spondylolisthesis of L5 on S1, status

post hemilaminotomy at L4-5 and L5-S1 levels, and degenerative disc disease at the L3-4, L4-5 and L5-S1 levels. (*Id*. at 331-33.) Additionally, Ms. Leopold testified that three or four panic attacks per week could preclude plaintiff's ability to sustain any employment, and, even assuming plaintiff did not suffer three or four panic attacks per week, plaintiff could still only perform sedentary work if he could sit for one hour and take regular breaks. (*Id*. at 436-37.)

Although plaintiff worked for several years after his back operations, until April 1991, and only takes Tylenol to ease his pain, the court finds the objective medical evidence to support plaintiff's subjective complaints. In any event, the regulations state that, "[w]hen the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, . . . [w]e will first recontact your treating physician . . . or other medical source to determine whether the additional information we need is readily available." 20 C.F.R. § 404.1512(e). Furthermore, the ALJ is obligated to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity. *See Devora v. Barnhart,* 205 F. Supp. 2d 164, 173 (S.D.N.Y. 2002). Accordingly, on remand the ALJ must explore with more precision the objective medical evidence, as well as plaintiff's subjective allegations of pain, and whether such an impairment would prevent him from performing light work, even with occasional nonexertional limitations in his ability to interact appropriately in large groups of people due to plaintiff's panic attacks. If necessary, the ALJ should obtain further information from plaintiff's treating physicians. Finally, if the ALJ again concludes that plaintiff retains the residual functional capacity to perform light work, he must then explain why plaintiff's residual functional capacity precludes the performance of his past relevant work, considering, in particular, plaintiff's exertional limitations to due his chronic back pain.

*Vocational Expert*

_____ The Commissioner also concedes that the ALJ committed certain legal errors when evaluating whether plaintiff was disabled under step five of the sequential analysis.

First, the ALJ's hypothetical to Ms. Leopold was improper. To determine whether jobs exist in significant numbers in the national economy that plaintiff could perform, the ALJ posed a hypothetical to Ms. Leopold that included plaintiff's medical conditions, in addition to information about plaintiff's age, education and vocational profile. (Admin. R. at 435-36.) By including plaintiff's medical conditions, rather than plaintiff's resulting exertional and nonexertional limitations, as factors in the hypothetical, the ALJ improperly solicited a medical opinion from Ms. Leopold. *See* 20 C.F.R. § 404.1566(e) (vocational experts are utilized to determine whether an individual's work skills can be used in other work and the specific occupations in which they may be used).

Second, Ms. Leopold's testimony regarding the transferability of plaintiff's skills from his past relevant work was unclear. Ms. Leopold first testified that plaintiff had acquired technical skills specifically related to the insurance industry. (Admin. R. at 435.) Ms. Leopold later testified, however, that although plaintiff retained the appropriate skills to perform work in the insurance industry, plaintiff's skills were not transferable to any other job. (*Id*. at 438.) As the Commissioner points out, the issue of transferability is significant here because, as of plaintiff's fifty-fifth birthday on January 22, 2004, plaintiff would be deemed "disabled" under both Medical-Vocational Rules 201.06 (residual functional capacity for only sedentary work) and 202.06 (residual functional capacity for only light work), if he lacked transferable skills. *See* 20 C.F.R. pt. 404, subpt. P, app. 2. On the other hand, if plaintiff's skills were transferable, plaintiff would be deemed "not disabled" under both

Medical-Vocational Rules 201.07 (residual functional capacity for only sedentary work) and 202.07 (residual functional capacity for only light work). *Id.* On remand, therefore, the ALJ must to resolve the discrepancy in Ms. Leopold's testimony regarding the transferability of plaintiff's skills before relying on it to find plaintiff "not disabled."[6]

Finally, Ms. Leopold provided no information on the number of "other" jobs of "an insurance nature" existing in the national economy. Without such information, the Commissioner cannot sustain his burden of proof at step five to show that plaintiff could adjust to other work which exists in significant numbers in the national economy. *See Draegert,* 311 F.3d at 474; 20 C.F.R. § 404.1520(g).

## III. Conclusion

The Social Security Act is a remedial statute which must be "liberally applied"; its intent is inclusion rather than exclusion. *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975). Consistent with that view, "courts have not hesitated to remand for the taking of additional evidence, on good cause shown, where relevant, probative and available evidence was either not before the Secretary or was not explicitly weighed and considered by him, although such consideration was necessary to a just determination of a claimant's application." *Id.*

Accordingly, this case is remanded to the Commissioner for further evidentiary proceedings consistent with this Memorandum and Order, pursuant to the fourth sentence of 42 U.S.C. § 405(g). To prevent delay in the processing of plaintiff's case, further proceedings before the ALJ must be

---

[6]The court further notes that the ALJ's reliance on Medical-Vocational Rule 202.05 in finding plaintiff not disabled is not supported by substantial evidence because Rule 202.05 corresponds to a person with unskilled or no past relevant work history. (Admin. R. at 19-20.) *See* 20 C.F.R. pt. 404, subpt. P, app. 2. By contrast, the record makes clear that plaintiff's past relevant work history was skilled or semi-skilled. *See* DOT, Code No. 241.267-018, 214.482-018.

completed within sixty days of the issuance of the order, i.e. by October 29, 2007; if plaintiff's benefits remain denied, the Commissioner is directed to render a final decision within sixty days of plaintiff's appeal, if any. *See Butts v. Barnhart*, 388 F.3d 377, 388 (2d Cir. 2004) (suggesting procedure and time limits to ensure speedy disposition of Social Security cases following remand by a district court). "[I]f these deadlines are not observed, a calculation of benefits owed [to plaintiff, John Kopcinski] must be made immediately." *Id*.

SO ORDERED.

DATED:      Brooklyn, New York
            August 29, 2007

_____/s/_____
DORA L. IRIZARRY
United States District Judge